Devin McRae SBN 223239
 *dmcrae@earlysullivan.com*
Jeremy Gray, SBN 150075
 *jgray@earlysullivan.com*
EARLY SULLIVAN WRIGHT
 GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

Attorneys for Jacob L.C. Broido

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| Jake Broido,<br><br>        Plaintiff,<br><br>       v.<br><br>Warner Music Group Corp.; NBC Universal Media, LLC; the AGM & SAG-AFTRA Intellectual Property Rights Distribution Fund;  Screen Actors' Guild-American Federation of Television and Radio Artists, AFL-CIO and Does 1-25, inclusive.<br><br>        Defendants. | **CASE No. 2:26-cv-00947**<br><br>**COMPLAINT FOR:**<br><br>   **1.**   **Declaratory Relief;**<br>   **2.**   **Accounting;**<br>   **3.**   **Breach of Implied Contract;**<br>   **4.**   **Fraudulent Concealment;**<br>   **5.**   **Breach of Fiduciary Duty;**<br>   **6.**   **Conspiracy to Defraud;**<br>   7.   **Violation of Business and Profession Code Sections 17200 et seq.**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**SEEKING STATEWIDE OR NATIONWIDE RELIEF** |

Plaintiff Jacob L.C. Broido ("Plaintiff" or "Broido") brings this action against Defendant Warner Music Group Corp. ("Warner Music"); NBC Universal Media, LLC ("NBC"); Universal Music Publishing Group, Inc. ("Universal Music Publishing"); Aton Ben-Horin ("Ben-Horin"); the AGM & SAG-AFTRA Intellectual Property Rights Distribution Fund (the "AFM Fund"); Screen Actors' Guild-American Federation of Television and Radio Artists, AFL-CIO ("SAG"); and Does 1-25 inclusive (collectively, "Defendants") and in support thereof alleges as follows:

## INTRODUCTION

1. The Fast and Furious franchise of films (the "Franchise") has generated lifetime revenues of over $10 billion.

2. After grieving the tragic death of Paul Walker in 2013, it inevitably became necessary for the producers of the Franchise to figure out how to say goodbye to Walker and his character Brian O'Conner in *Furious 7*.

3. At some point, in about 2015, the Franchise's producers let it be known that they wanted a song to play as the backdrop to the farewell to Walker and his character, O'Conner. Charlie Puth ("Puth") was one of the artists who began working on such a song.

4. At that time, the plaintiff in this matter, Jake Broido, was making a career shift. An accomplish musician who had sung professionally for major artists, whose band sold out the Grammercy in New York, who had sold tens of thousands of tickets to fans, he was attempting to leverage his experience as an artist into a career as an executive in the music industry.

5. Although Puth was not yet signed to Warner, he was occasionally at their offices and knew of Broido and his musical background.

6. One day, in early 2015, Puth walked up to Broido and asked "do you know how to do 'gang vocals'?" "Gang vocals" are a blend of vocals almost reaching screaming designed to generate significant emotion in the listener. By that time, Broido had been studying, practicing, recording, and performing these style of vocals

1 for over ten years. Broido responded to Puth that he was highly accomplished at that
2 style of singing.

3        7.      Puth said, "Come with me," and off they went to a studio where work
4 was underway on what would become the song "See You Again" (the "Song"). The
5 Song ultimately became the emotional bedrock of *Furious 7* and perhaps the most
6 successful song of the last decade.

7        8.      But when Broido arrived at the recording session, the Song was a work
8 in progress. The understanding was that they were creating something to pitch to be
9 included in the *Furious 7* movie to accompany with the sequence in the movie where
10 the characters would say goodbye to O'Connor, the character, and the beloved
11 Walker. Broido's skill and professionalism as a gang singer manifested itself in
12 shaping the arrangement and orchestration of the Song. Moreover, Broido was trusted
13 to make (and in fact made) artistic and creative choices about his vocal performance.
14 Broido specifically tailored his performance with the understanding that it would
15 serve as the backdrop to what would be one of the most emotional sequences in the
16 movie.

17        9.      Unusually, Broido was not asked to sign, and did not sign, any agreement
18 relating to his performance on the Song.  In particular, he did not sign a "work made
19 for hire" agreement or anything like it.

20        10.     The power of Broido's performance is demonstrated by its use in *Furious
21 7*. The director, the editor and the producers were obviously captivated by Broido's
22 soaring vocal, and used it essentially alone, to provide the emotional backdrop to the
23 farewell to Walker (and O'Brien).  Indeed, during this signature sequence in the
24 movie, Broido's vocals are repeated no less than four times.  Put simply, Broido's
25 performance is of equal (if not greater) importance to this sequence in *Furious 7* as
26 those of Mr. Puth or Mr. Khalifa.

27        11.     Words in a complaint, obviously, cannot even remotely capture Broido's
28 profound contribution to *Furious 7*. Take a moment to watch this linked YouTube

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

3
COMPLAINT

video and listen to Broido astonishing work[1]. Broido is obviously proud of his role in *Furious 7*. But the entertainment business is just that, a business. And everyone else got paid.

      12.    Charlie Puth got paid.

      13.    Wiz Kalifa got paid.

      14.    Vin Diesel got paid.

      15.    Dwayne Johnson got paid

      16.    Michelle Rodriguez got paid.

      17.    Tyrese Gibson got paid.

      18.    Kurt Russell got paid.

      19.    Jason Statham got paid.

      20.    Brian Tyler (Music) got paid.

      21.    Christian Wagner (Editor) got paid.

      22.    Dylan Highsmith (Editor) got paid.

      23.    Kirk Morri (Editor) got paid

      24.    Leigh Folsom Boyd (Editor) got paid.

      25.    Neal H. Moritz (Producer) got paid.

      26.    James Wan (Director) got paid.

      27.    Writer Chris Morgan got paid.

      28.    Warner film executive Greg Silverman got paid.

      29.    Ron Meyer got paid.

      30.    SAG president Ken Howard got paid.

      31.    It is, of course, not surprising that Broido's efforts to get paid have been, for a decade, obfuscated and obstructed by Warners. That is the long history of the music industry; to make executives rich at the expense of artists.

      32.    But Universal is a different story. The company touts its support for

---

[1]    https://www.youtube.com/watch?v=7cPMriE8fKU



artists. Yet it has no qualms about appropriating Broido's considerable talents; deploying them in the most emotionally charged sequence in the Franchise's history, but then refusing to compensate Broido for his singular contribution to the *Furious 7*.

33.    As described in detail below Broido brings this action to enforce his Copyright and other artist rights in order to seek proper compensation for his contributions to the Franchise and to be awarded damages for fraud and for breach of fiduciary duty by Warner and others.

34.    Over the past decade, both Universal and Warner have taken steps to ensure that Broido could not assert his rights in his performance on the Song. And they will likely respond to this Complaint by claiming that Broido should have acted sooner or that he has at some point signed some document which undermines his claims. However, as detailed below, because of the fraudulent concealment by the defendants in this action, they are estopped from making any such arguments.

35.    When both companies registered their purported Copyrights in the Song they represented that it was part of a "larger work", *i.e.* the *Furious 7* film. Moreover, the Song essentially made its debut in the Film as it had not previously been released on any album or other compilation of music.

36.    Yet when Warner registered the song with the organization charged with distributing the Song's revenues to artists like the Plaintiff, it engaged in two acts of deception. First, Warner intentionally sought to hide Broido's indispensable contribution to the Song by not even listing his name among the artistic contributors. Instead, Warner made a vague reference to Broido as one of "3 A&R Staffers".

37.    More significantly, Warner misclassified the Song as "non-theatrical." This is so self-evidently false that the only possible explanation for this misrepresentation is Warner's desire to deprive Broido of his right to participate in any licensing of the Song. Specifically, if Warner had correctly registered the Song as "theatrical", then Broido could and would have, over the past decade, been entitled to participate in any licensing of the Song for television, reissues of the song, use of

1   Broido's recorded views, promotional materials for Furious 9, social media licensing
2   (including META, SNAP, TikTok etc.) and others over the past decade. Warner's
3   false classification of the Song has deprived Broido of millions of dollars.

4       38.    When Broido inquired of Warner regarding any monies he was owed his
5   was falsely assured that the company was looking after his interests. Broido even
6   communicated with Aton Ben-Horin, whom Broido viewed as his mentor, and was
7   assured that he was looking into the monies due to Broido. Of course, neither Warner
8   nor Ben-Horin were actually looking after Broido's interests (as they were
9   representing) but rather were acting in furtherance of their scheme to deprive him of
10  his rights and due compensation.

11      39.    For its part, even though Universal's filmmakers had exploited Broido's
12  talents at a signature moment in the film, they do not even list him in the credits.

13      40.    In more recent years, as Broido has sought to have the song correctly
14  registered as "theatrical" both Warner and Universal, along with others, have
15  undertaken to deprive him of his rights.

16      41.    The claims arising out of this misconduct by Warner, Universal and
17  others are manifold. Broido did not sign away his rights and thus he seeks the rights
18  associated with his co-ownership of the Copyright in the Song. Broido also seeks
19  damages for Warner and Universal's fraud and concealment regarding the registration
20  of the Song and regarding Broido's rights it its exploitation via licensing.

21                                   **PARTIES**

22      42.    Plaintiff is an individual who resides in Los Angeles, California.

23      43.    On information and belief, Warner Music is a corporation organized and
24  existing under the laws of the State of Delaware with its headquarters in New York,
25  New York.

26      44.    On information and belief, SAG is a labor union with its headquarters in
27  Los Angeles, California.

28      45.    On information and belief, NBC Universal is a corporation organized

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1   and existing under the laws of the State of Delaware with its headquarters in New

2   York, New York.

3        46.    On information and belief, Universal Music Publishing is a corporation

4   organized and existing under the laws of the State of Delaware with its headquarters

5   in Santa Monica, California.

6        47.    On information and belief, the AFM Fund is a 501(c)(6) organization

7   organized and existing under the laws of New York and with its principal place of

8   business located in California.

9        48.    On information and belief, Aton Ben-Horin is an individual residing in

10  the United States whose exact domicile is presently unknown, but who is subject to

11  personal jurisdiction in California due to acts committed in California.

12       49.    Does 1-25 are individuals or entities which either directly, indirectly, or

13  in concert with other defendants possess responsibility and/or liability under the

14  claims alleged herein, but are currently unknown to Plaintiff. Such individuals and/or

15  entities will be added to this action when, and if it becomes appropriate to do so.

16                          **JURISDICTION AND VENUE**

17       50.    This action arises under 17 U.S.C. section 101 et seq., known as the

18  federal Copyright Act. This Court has federal question jurisdiction under 28 U.S.C. §

19  1331. This Court has supplemental jurisdiction over Plaintiff's state-law claims

20  pursuant to 28 U.S.C. § 1367(a) because those claims derive from a common nucleus

21  of operative fact. The state-law claims are such that  Plaintiff would ordinarily be

22  expected to try them in a single judicial proceeding with the federal claims, and

23  therefore form part of the same case or controversy as the federal claims.

24       51.    Venue lies in this District under 28 U.S.C. §§ 1391(b). A substantial part

25  of the acts or omissions giving rise to the claims alleged occurred in Los Angeles,

26  California.

27  ///

28  ///

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

# FACTUAL ALLEGATIONS

## Background

52.    Paul Walker died in November of 2013 while NBC's *Furious 7* was still in production[2]. As a result, NBC paused production.

53.    In August of 2014, Broido worked for MBO Enterprise Solutions, Inc., ("MBO") a provider of administrative, payroll, consolidated billing, contractor payment, and services for businesses. Pursuant to his employment with MBO, Broido provided administrative and support staff services for Warner Music.

54.    In April of 2014, NBC resumed production on *Furious 7*, using body doubles and digital replacement to finish the final farewell sequence where Vin Diesel's character says goodbye to Paul Walker's character[3]. Production wrapped in July of 2014[4].

55.    On information and belief, NBC solicited Charlie Puth, through Warner Music, to compose and perform a tribute song to Paul Walker, to be used as part of the film score to *Furious 7* in the climactic "goodbye" sequence. Specifically, on information and belief, NBC made available to Puth that very sequence and documents describing that "goodbye" sequence, so that Puth would know exactly what scenes he was scoring *before* the Song was created.

56.    At the time of the creation of the Song, Puth and the other musicians working on the Song (the "Other Joint Authors") were affiliated with Artist

---

[2] https://www.nbclosangeles.com/news/local/fast_and_furious_7__delayed__but__won_t_be_scrapped__following_paul_walker_s_death__report/2053776/

[3] https://variety.com/2014/film/news/fast-furious-7-may-use-body-doubles-cgi-for-paul-walker-scenes-1201145145/

[4] https://deadline.com/2014/07/fast-furious-7-wraps-filming-thank-you-to-fans-801953/

Publishing Group ("APG"), the publishing company founded and controlled by Mike Caren[5]. During the same period, Caren served as President of Worldwide A&R for Warner Music Group, exercising executive oversight over A&R functions of Warner Music-affiliated labels, including Atlantic Records. The *Furious 7*: Original Motion Picture Soundtrack was ultimately produced and released by Atlantic Records, a Warner Music Group label, and Caren is credited in connection with the soundtrack's production and A&R supervision. Shortly thereafter, Puth entered into a recording relationship with Atlantic Records. In sum, Warner Music was not just the place Broido happened to be when he was solicited to sing by a lone singer; rather, Warner Music was the central facilitating entity that was shepherding this project for NBC. From the outset, the Other Joint Authors, their publisher, Warner Music's senior leaders, and the producing label were all working on this song for one purpose: for use in *Furious 7*.

## **The Song**

57.    Broido was working in the Warner Music offices when he was approached by Puth who was working on the Song. Puth asked Broido, "Do you know how to sing 'gang' vocals?" Having spent the better part  of a decade developing precisely this vocal style, Broido enthusiastically agreed to collaborate and accompanied Puth into the recording studio.

58.    At the time of the creation of the Song, nobody alerted Broido that the plan was to use the Song in *Furious 7*. Instead, the Other Joint Authors made statements to Broido that the song would be used as part of a *pitch* for *Furious 7*. At the time, Broido reasonably understood this to mean that his performance was being used as a *pre-visualization*, merely a temporary track which would be re-recorded over later after the Joint Authors had, in effect, "auditioned" for the job. Given the total lack of any written contract, it was simply implausible, given the information

---

[5] https://www.songwriteruniverse.com/ben-maddahi-apg-2015/

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1   available to Broido at the time, that two major multi-billion dollar companies would
2   misappropriate his work whole-cloth. But this understanding was fundamentally
3   predicated on a lie. This was not really an audition; that was simply a pre-text to get
4   free work. The relationship between Warner Music, NBC, and the Other Joint Authors
5   was not at arm's-length; rather, everybody already knew that this song was going to
6   be lifted verbatim into *Furious 7*. And the song was not a pitch; it was a product.

7       59.    Broido's skill and professionalism as a gang singer manifested itself in
8   shaping the arrangement and orchestration of the Song. In addition, Broido made
9   artistic and creative choices about his vocal performance. As a result, Broido's
10  performance and creative decisions became a prominent, central aspect of the final
11  recording of the Song.

12      60.    The collaboration was not a work-made-for-hire. Broido was not asked
13  to sign, and did not sign, any document purporting that his performance constituted a
14  work-made-for-hire. Moreover, musical performance was far outside the scope of his
15  employment with MBO, which consisted entirely of administrative and office staffing
16  support. At no point did Broido enter into an employer-employee relationship with
17  Warner Music until *after* his performance had been recorded.

### Background Regarding Monetization

19      61.    On information and belief, Warner Music is a signatory to SAG's Sound
20  Recordings Agreement (the "SAG CBA"), which requires minimum wages for vocal
21  performances, health and pension contributions, and other protections. All
22  performers, regardless of union membership, are intended third-party beneficiaries to
23  the SAG CBA; Warner Music is not permitted to circumvent protections by simply
24  hiring non-union performers. Nonetheless, Warner Music did not pay Broido the
25  required minimum basic session fee, nor did it make any payments to the health and
26  pension funds.

27      62.    On information and belief, as the parties had intended all along, Puth
28  entered into an agreement with Warner Music purporting to grant an exclusive license


EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

to the copyright for the Song. Puth never obtained Broido's consent to such licensure.

63.    On information and belief, as a result of Puth's agreement, Warner Music caused the Song to be registered with the United States Copyright Office, bearing number PA 2-031-758, without listing Broido as an author. A true and correct copy of Warner Music's invalid and incorrect copyright registration ("Warner's Fraudulent Registration") is attached as **Exhibit A.** Warner Music's copyright registration listed the Other Joint Authors as joint authors, but not Broido. The registration indicates that "Furious 7" was the "Larger Work" for which the Song was made as part and parcel.

64.    On information and belief, Warner Music licensed the Song to NBC Universal for inclusion in the *Fast and the Furious* film franchise. Warner Music never obtained Broido's consent to such licensure.

65.    On information and belief, Universal Music Publishing caused the Song to be registered with the United States Copyright office, bearing number PA 2-006-622. A true and correct copy of Universal Music Publishing's copyright registration is attached hereto as **Exhibit B**. Universal Music Publishing's registration lists itself and "UPG Music Publishing" as the authors of the Song as the "Employer For Hire" of "Charlie Puth, Jr.," "Justin Scott Franks," "Cameron Thomaz," and "Andrew Cedar."

66.    Copyright law mandates a digital royalty for musicians when music is distributed for certain uses, to be collected and distributed through a nonprofit collective. 17 U.S.C. 114(g)(2). Pursuant to 17 U.S.C. sections 1006(b)(1) and 114(g)(2)(B), the AFM Fund collects some of these royalties and distributes the funds to nonfeatured musicians and vocalists.

67.    On information and belief, the AFM Fund requires certain disclosures before the AFM Fund will agree to collect and distribute royalty payments on its beneficiaries' behalf. For example, on information and belief, the AFM Fund requires, before accepting royalty payments from distributors, that the music distributors identify all the performers on the songs so that the AFM Fund will know to whom to

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1  make the royalty payments.

2      68.    On information and belief, in Warner Music's dealings with the AFM
3  Fund, Warner Music used SAG as an intermediary and SAG agreed to accept
4  documentation on behalf of the AFM Fund.

5  **<u>Warner's Pattern Of Deception</u>**

6      69.    Warner Music used this alter ego relationship to make deceptive
7  nondisclosures to the AFM Fund through SAG. Specifically, on information and
8  belief, Warner Music submitted documentation to the AFM Fund, through SAG,
9  listing under "background singers" "3 A&R staffers," rather than simply listing
10  Broido's identity.

11      70.    This nondisclosure was straightforwardly dishonest. "A&R" is an
12  industry acronym for "Artists & Repertoire," the department that scouts talent,
13  evaluates demos, and serves as a liaison between the artists and the label. Broido's
14  performance had nothing to do whatsoever with the A&R department. By listing
15  "three A&R staffers" under "Background singers," Warner Music "papered the file,"
16  technically disclosing to the AFM Fund that there *might* be other "background
17  singers" while simultaneously implying that these were not performers at all. The
18  implication was, in essence, "Oh yeah, I  guess there were some office guys there,
19  too."

20      71.    The lie worked. Warner Music duped the AFM Fund into agreeing to
21  accept royalty payments for the Song even though the AFM Fund had no idea for
22  whom it was collecting the money. As a direct result, Broido was not just delayed
23  payment, but *information*.

24      72.    The effect was suspiciously convenient for Warner Music. Warner
25  Music had just convinced NBC to incorporate Broido's work (sans work-for hire
26  agreement) into NBC's multi-billion dollar film franchise. Broido now represented a
27  cloud on NBC's chain of title and the threat of litigation could put the entire premiere
28  at risk. By using deceit to deprive Broido of the information, Warner Music was able

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1    to cover up an embarrassing failure.

2        73.    However, as a result of Warner Music's hiding Broido's identity, royalty

3    payments due to Broido were delayed, causing Broido harm.

4        74.    All the while, Warner Music was giving Broido "the run around," telling

5    lies in order to stymie Broido's investigation. Specifically, Warner Music made

6    misleading statements, partial royalty payments, and assurances to Broido that it was

7    pursuing an investigation, including that it would "look into this" and that it would

8    "follow up," only for Warner Music to ultimately "ghost" Broido. In reality, Warner

9    Music's assurances were merely a scheme to conceal facts from Broido in an attempt

10   to "wait out the clock." After Warner Music last promised to "follow up," Broido sent

11   four more emails, which went entirely unanswered. Warner Music simply stopped

12   responding entirely.

13       75.    In addition to Warner Music's deceptive non-disclosure as to Broido's

14   identity, Warner Music also made false statements to the AFM Fund as to the purpose

15   for which the Song was created. The Song was conceived, recorded, and

16   commissioned specifically for use in *Furious 7*. It was not previously released on any

17   standalone album or commercial project prior to its incorporation on the film. Indeed,

18   both of the attached copyright registrations indicate that the song was part of the

19   "Larger work" of the *Furious 7* Original Motion Picture Soundtrack. (Ex. A; Ex. B).

20   Nonetheless, on information and belief, Warner Music made deceptive statements to

21   SAG and the AFM Fund, indicating that the Song should be classified as "non-

22   theatrical." As a result, Broido was cheated out of royalty payments and downstream

23   compensation.

24              **Broido Has Been Wrongfully Deprived Of Compensation**

25       76.    NBC Universal incorporated Broido's copyrighted work into *Furious 7*.

26   NBC used the Song in precisely the way it had always intended: as the film score for

27   the climactic "goodbye" sequence. NBC's use of the Song was "strikingly similar"

28   and immediately recognizable to a lay audience. Indeed, NBC used the moment from

1  the Song where Broido was most featured, where his performance is most identifiable
2  and powerful, at the climactic moment when the two heroes part ways.

3      77.    On information and belief, on physical sales of the Song, Warner Music
4  and Universal Pictures (a division of NBC) both asserted joint ownership in the "p-
5  line" (the ℗ marking on a product containing a sound recording indicating ownership
6  of the master recording). Tellingly, and in furtherance of prior allegations on this
7  topic, this designation is also an industry standard for theatrical classification.

8      78.    Warner Music has continued to exploit the Song without paying Broido
9  as a joint author or even as a backup singer. On information and belief, Warner has
10  licensed the Song for use in an AT&T commercial, for use in the television series *The*
11  *Simpsons*, and for the promotion of Puth's career in concerts. Broido's payments for
12  this commercial do not include additional royalties to which he is entitled.

13      79.    Broido's performance on the Song is so iconic and recognizable that
14  when Puth performed the Song live, he did not hire backup singers. Instead, he
15  specifically sang along to Broido's pre-recorded performance. Broido was not paid
16  for this public performance.

17      80.    Neither the Other Joint Authors, nor Warner Music, nor NBC have ever
18  unambiguously repudiated Broido's claim of joint authorship. After all the time
19  Broido spent emailing Warner Music and NBC's Business and Legal Affairs team,
20  *not once* did anybody say anything to the effect of: "We own this, not you." It was
21  not until 2025 that Broido became aware of any adverse copyright registrations.

22      81.    Because of false and misleading statements by Warner Music, Broido
23  was not aware of any facts indicating the accrual of a claim until 2025 when he first
24  heard the Song used in a Youtube clip of the climactic "goodbye" sequence in *Furious*
25  *7*. Specifically, Broido was not aware that the Song had been registered as a "sound
26  recording" (as opposed to a "theatrical" recording) until April 2025, nor has he ever
27  personally watched the *Furious 7* film.
28  ///

### FIRST CLAIM FOR RELIEF

**(For Declaratory Relief Regarding Copyright Ownership Against Warner Music, NBC Universal, Universal Music Publishing, and Does 1-25)**

82.     Plaintiff repeats and reincorporates by reference the allegations in the above paragraphs as if fully set forth herein.

83.     This claim arises under the declaratory judgment provisions of 28 U.S.C. sections 2201 and 2202 and under 17 U.S.C. section 101 et seq., known as the federal Copyright Act.

84.     As illustrated above, Broido is the co-owner of the copyright to the Song.

85.     On information and belief Warner Music and NBC claim copyright ownership as to the Song through a grant from the Other Joint Authors. Such ownership was not granted because neither Warner Music nor NBC obtained Broido's consent. Moreover, Warner Music's copyright registration does not list Broido as a co-author.

86.     On information and belief, Universal Music Publishing claims copyright ownership as to the Song through a work-made-for-hire agreement. Universal Music Publishing's copyright registration for the Song fails to list Broido as a co-author.

87.     Therefore, an actual and justifiable controversy exists sufficient for this Court to declare the rights and remedies of the parties in that there is a dispute between Warner Music, NBC, and Broido as to whether Broido still co-owns the copyright to the Song.

88.     Broido seeks a declaration from the Court that Broido is a current co-owner of the Song and that the sound recording was not made pursuant to a work-made-for-hire agreement with Warner Music or NBC.

### SECOND CLAIM FOR RELIEF

**(For Breach of Implied in Fact Contract Against All Defendants)**

89.     Plaintiff repeats and reincorporates by reference the allegations in the

1  above paragraphs as if fully set forth herein.

2       90.    There is a difference between agency law and copyright law, such that

3  one can simultaneously act as the agent of an entity in the creation of a creative work

4  without creating a "work-made-for-hire."

5       91.    Copyright law is a creature of federal statute and the U.S. federal

6  Constitution; therefore, a work is not a work-made-for-hire unless specific statutory

7  requirements are met. 17 U.S.C. 201(b) defines a work-made-for-hire as: "(1) a work

8  prepared by an employee within the scope of his or her employment; or (2)… if the

9  parties expressly agree in a written instrument signed by them that the work shall be

10 considered a work made for hire." *Horror Inc. v. Miller*, 335 F. Supp. 3d 273, 294 (D.

11 Conn. 2018), *aff'd,* 15 F.4th 232 (2d Cir. 2021).

12      92.    Agency law, by contrast, is a relationship far easier to create. An agent

13 is one who represents another, the principal, in dealings with third persons. *Hearden*

14 *v. Windsor Redding Care Center, LLC*, 103 Cal.App.5th 1010 (3d Dist. 2024).

15 "Agency" is the relationship which results from the manifestation of consent by one

16 person to another that the other will act on the principal's behalf and subject to their

17 control, and consent by the principal. *West v. Solar Mosaic LLC*, 105 Cal.App.5th 985

18 (2d Dist. 2024).

19      93.    On information and belief, Puth was acting as agent to both Warner

20 Music Group and NBC Universal, with consent of both principals, when he asked

21 Broido to perform artistic services on the Song. On information and belief, it was

22 abundantly clear to everybody at the time of the implied contract that the Song was

23 ultimately being made for NBC Universal's *Fast & Furious* franchise. Indeed, Warner

24 Music's copyright registration for the Song lists NBC's *Furious 7* as the "Title of the

25 Larger Work." Moreover, on information and belief, NBC had made the scene from

26 *Furious 7* in which the Song was ultimately used available to Puth while the Song

27 was being created. Accordingly, all the Defendants were coordinating together with a

28 wink-and-nudge agreement that, regardless of the technicalities of how the copyright

chain of title would be settled, the creation of the song would be subject to Warner Music's and NBC's ultimate control.

94.    In addition, Warner Music ratified Puth's agreement with Broido when it made partial payments to Broido.

95.    Moreover, on information and belief, NBC ratified Puth's agreement with Broido when, with full knowledge that Broido had performed unpaid musical services on the recording, NBC incorporated Broido's performance into the *Fast and Furious* franchise. It cannot be argued that NBC was unaware of Broido's existence or of his work on the Song. Broido's voice is prominent and obvious on the recording, and NBC specifically used Broido's big moment in the song at the climactic moment in *Furious 7* where Vin Diesel's character says goodbye to Paul Walker's character.

96.    On information and belief, Puth was acting as agent to the Other Joint Authors when he solicited Broido to perform artistic services on the Song. Everybody was working altogether to bring the project together. None of the Other Joint Authors objected to Broido's inclusion.

97.    Broido and Puth were parties to an implied in fact contract that Broido would be paid for his artistic services on the Song, which, as alleged above, arose out of the conduct of the parties, the communications by the parties, and the custom and practice in the entertainment industry. Indeed, Warner Music's subsequent conduct, including its issuance of partial payments to Broido for his performance, evidenced its assent to this established industry custom.

98.    Puth voluntarily accepted and used Broido's creative services in the Song.

99.    Broido's contribution was valuable. Having spent nearly a decade refining his craft, his creative services helped to define the unique sound of the Song and contributed to the song's commercial success. Moreover, Broido's contribution was valuable as a component to the *Furious 7* film, with Broido's raw and heartfelt performance creating a cinema-narrative consonance, which altogether formed a

touching tribute to the late Paul Walker.

100.   An essential term of that implied contract was that Broido would be compensated for his performance of artistic services.

101.   It would have been objectively unreasonable for Puth to believe that Broido rendered his artistic services gratuitously. That is not the custom of the music industry. On information and belief, Puth did not subjectively believe that Broido would render his services gratuitously.

102.   It would have been objectively unreasonable for Puth to believe that Broido's performance of artistic services was within the scope of his employment with MBO, the temp agency. Factually, musical performance was far outside of Broido's employment for MBO, which covered only administrative assistance. Moreover, the MBO agreement specifically requires work orders for anything relating to copyright and there are none.

103.   Nonetheless, Defendants never paid Broido what Broido is owed. Broido has therefore been damaged in an amount to be proved at trial.

104.   Defendants fraudulently concealed facts to mislead Broido, pretending to investigate, concealing the breach, and giving assurances that induced Broido to delay filing this instant lawsuit. Conversely, Broido exercised reasonable diligence by requesting documents from Warner Music, hiring counsel to investigate, and filing suit once he discovered the wrongdoing. As a result, Broido was not aware that his claim had accrued until 2025.

## THIRD CLAIM FOR RELIEF

### (For Fraudulent Concealment Against Warner Music, NBC, Aton Ben-Horin and Does 1-25)

105.   Plaintiff repeats and reincorporates by reference the allegations in the above paragraphs as if fully set forth herein.

106.   <u>Active concealment of material fact</u>: the AFM Fund has statutory duties pursuant to 17 U.S.C. section 114 to pay musicians certain royalties based on whether

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1  the musician is "featured" or "non-featured." 17 U.S.C.(g)(2). On information and

2  belief, Warner Music made false statements to the AFM Fund to hide Broido's

3  identity from the AFM fund, to downplay Broido's "featured" status on the Song, and

4  to mischaracterize the Song as nontheatrical. Specifically, in communications to the

5  AFM Fund, Warner listed under "Background singers" only "three A&R staffers"

6  instead of listing Broido's identity and directly mischaracterized the Song as being

7  merely a "sound recording," as opposed to a "theatrical" recording.

8       107.  <u>Duty to disclose:</u> 17 U.S.C. section 114 imposes duties on entities

9  performing sound recordings to make residual payments. The AFM Fund is the entity

10 that collects and distributes those payments. To that end, the AFM Fund directly

11 inquires of entities making payments for statutory licenses to identify all the

12 performers on the song. On information and belief, the AFM Fund did ask Warner

13 Music to identify all the performers who performed on the Song or at least the identity

14 of the background singers. Rather than straightforwardly answering the question,

15 Warner Music played hide-the-ball by listing "three A&R staffers" instead of

16 Broido's identity.

17      108.  <u>Intent to defraud:</u> Warner Music lied to get out of trouble. Having failed

18 to seek a work-made-for-hire agreement for a song that went multi-platinum (i.e., an

19 intellectual property worth tens of millions of dollars, if not more), Warner Music

20 sought to side-step scrutiny by hiding Broido's identity, thereby obviating statutory

21 systems designed by Congress to ensure musicians get paid what they are due. The

22 lie worked: Broido was kept in the dark for years and was forced to expend resources

23 he could not afford to claw back the money he was supposed to receive automatically.

24      109.  <u>Justifiable reliance:</u> The AFM Fund was effectively working as Broido's

25 agent and fiduciary when Warner Music made the misstatements because the AFM

26 Fund was engaged in efforts to collect money owed to Broido at the time. As a result

27 of Warner Music's concealments, the AFM Fund could not investigate the extent that

28 Broido was "featured" on the album because they did not have Broido's identity.

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1  Consequently, the AFM Fund was forced to accept Warner Music's characterization

2  of Broido as merely a non-featured back-up singer in a non-theatrical song.

3      110.  <u>Resulting damage:</u> As a direct and foreseeable result, the AFM Fund paid

4  Broido significantly less than he was due in royalty payments.

5      111.  <u>Warner Music joins the conspiracy:</u> Warner Music was working as

6  NBC's agent when it defrauded Broido. NBC and Warner Music were working

7  together from the beginning to craft a song for a specific scene in NBC's movie

8  franchise. Indeed, Warner Music and NBC both asserted joint ownership in the "p-

9  line" of the Song (the ℗ marking on the product containing the sound recording

10 indicating ownership of the master recording), and Warner Music's copyright

11 registration lists Universal Pictures Music (a division of NBC) as a copyright

12 claimant. Warner Music's deceptions directly benefitted NBC because, by inducing

13 the AFM Fund to assume Broido's performance was "non-featured," Broido could

14 not negotiate with NBC as to the license to use the Song in *Furious 7*. Lastly, NBC

15 materially aided and furthered the fraud by frustrating Broido's investigation,

16 including when Ben-Horin made deceptive statements to Broido indicating that he

17 was investigating Broido's claims.

18                    **FOURTH CLAIM FOR RELIEF**

19      **(For Breach of Fiduciary Duty Against the AFM Fund and Does 1-25)**

20      112.  Plaintiff repeats and reincorporates by reference the allegations in the

21 above paragraphs as if fully set forth herein.

22      113.  The AFM Fund has three internal divisions: the Sound Recording

23 Division ("SRDF"), the Audiovisual Division ("AV"), and the Symphonic Division.

24 SRDF distributes certain royalties related to commercially-released sound recordings

25 that are not film scores. The AV division distributes royalties that come from music

26 exploited as part of theatrical motion pictures or other audiovisual works. The AV

27 department is where most of the high-dollar distributions occur because SVOD

28 platforms (like Netflix and Disney+) generate significant revenue. In sum, much of

Broido's compensation hinged on Warner Music's representation to the AFM Fund that the song was "non-theatrical."

114.  <u>Existence of fiduciary relationship</u>: The AFM Fund had fiduciary duties to Broido. As a 501(c) charity, the AFM Fund is not a membership-driven organization. Unlike a union, the AFM Fund collects and distributes royalties on behalf of singers and musicians without regard to union membership. These collected funds do not belong outright to the AFM Fund. Instead, this money is held in trust for the benefit of the musicians. The AFM Fund is not permitted to simply take the musicians' money for itself. Instead, the AFM Fund has a basic fiduciary duty to do due diligence to identify for whom it is collecting the money so that it can get the money to the musicians to whom the funds belong.

115.  <u>Breach</u>: The AFM Fund was asleep at the switch, making absurd and negligent decisions that allowed Warner Music and NBC to cheat Broido. First, the AFM Fund agreed to accept royalty payments on behalf of "three A&R staffers," without first inquiring as to whom they were collecting the money. In other words, the AFM Fund agreed to accept money, which, on information and belief, it used for its own operational expenses, knowing full well that it had no means to identify its beneficiary and would be putting itself entirely at the mercy of Warner Music to identify Broido, even though Warner Music had just, in writing, refused to identify Broido. Next, the AFM Fund uncritically accepted Warner Music's characterization of Broido's performance as "non-featured," a critical determination of fact which conveniently (for the AFM Fund) affected whether the AFM Fund had the right to collect money on behalf of Broido, sidestepping his right to negotiate on his own behalf, in the first place. Through their negligence, the AFM Fund tied their own hands: it could not simply ask Broido whether he was featured or otherwise because it did not do the barest due diligence to identify for whom it was collecting money. Indeed, because Broido's performance is so prominent on the work, it seems unlikely that anyone at the AFM Fund listened to the Song even one time. Furthermore, the

AFM Fund was negligent when it uncritically accepted Warner Music's characterization of the song as non-theatrical. Because the AFM Fund failed to require Warner Music to identify Broido's identity but agreed to accept money on his behalf anyway, Warner was able to pass off a song that was never released as a single prior to its use as part of an "original motion picture soundtrack" (per Warner Music's copyright registration) as "non-theatrical."

116. <u>Causing Damage</u>: As a result, payments due to Broido were delayed and diminished and Broido was unable to negotiate with NBC, causing Broido to lose vast sums of remuneration due to him.

## **FIFTH CLAIM FOR RELIEF**

### **(For Conspiracy to Defraud Against Warner Music, NBC, SAG, Aton Ben-Horin and Does 1-25)**

117. Plaintiff repeats and reincorporates by reference the allegations in the above paragraphs as if fully set forth herein.

118. <u>Warner Music committed fraud:</u> Warner Music failed to get a work-made-for-hire agreement for Broido. As a result, the rights to a multi-million dollar intellectual property were clouded. Rather than simply negotiating with Broido or even suing for declaratory relief, Warner Music resorted to "self-help." Specifically, it hid Broido's identity from the AFM Fund through misleading statements and fraudulent nondisclosure, on cue sheets and other documents, while communicating to Broido that it was "investigating."

119. On information and belief, as part of its efforts to erase Broido, Warner Music made false and misleading statements to the AFM Fund. For example, it is facially obvious from Warner Music's copyright registration (which listed *Furious 7* as part of the "larger work" for which the Song was part of the "OMPS," the original motion picture soundtrack) that the Song was always a "theatrical" song. but Warner Music could not admit that fact to the AFM Fund without risking exposure. So, on information and belief, Warner Music made false and misleading statements to the

AFM Fund to induce it to mis-classify the Song as "non-theatrical." Similarly, on information and belief, to hide its tracks, Warner Music made false and misleading statements to the AFM Fund to induce it to mis-classify Broido's performance as "non-featured."

120.  Ben-Horin assisted this fraud when he made false and deceptive statements indicating that he was personally investigating Broido's claims.

121.  <u>NBC joins Warner Music's fraud:</u> At some point, the AFM Fund started researching who the "three A&R staffers" were. Because the royalty payments lead to NBC, it stands to reason that the AFM Fund inquired with NBC. NBC obviously knew that the Song was properly classified as "theatrical," as it had listed "Furious 7 (OMPS)" right on the copyright registration, but it clearly never disabused the AFM Fund of that notion. Instead, NBC had strong motivation to join the lie: having now incorporated Broido's intellectual property into their multi-billion dollar film franchise, Broido's copyright claim was now a litigation risk.

122.  NBC also made false and deceptive statements to Broido that it intended to investigate Broido's claims (when in reality it was simply inducing Broido to "wait out the clock"), thereby joining Warner Music's fraud with the intent that the fraud be successful.

123.  As a result, on information and belief, Warner Music and NBC tricked the AFM Fund into misclassifying the Song as merely a "sound recording" rather than as "theatrical," causing Broido to lose royalty revenues and opportunities to negotiate against Warner Music and NBC.

124.  <u>SAG joins the conspiracy:</u> Once it became clear to the AFM Fund that its own negligence allowed Warner Music and NBC to defraud Broido, SAG engaged in a coverup, making false and misleading statements to Broido to convince him to drop his investigation.

///

///


EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1

## SIXTH CLAIM FOR RELIEF

2

### (For Violation of Business and Professions Code sections 17200 et seq.

3

### against All Defendants)

4      125.   Plaintiff repeats and reincorporates by reference the allegations in the

5   above paragraphs as if fully set forth herein.

6      126.   Defendants' actions as described herein constitute unlawful, unfair, and

7   fraudulent business practices proscribed by California Business and Professions Code

8   sections 17200 et seq.

9      127.   As a result of Defendants' unlawful, unfair, and fraudulent acts, Broido

10   was cheated out of residual payments, the opportunity to negotiate his own licensing

11   deal with parties who wished to exploit the Song, and loss of career opportunity due

12   to reputational harm.

13      128.   As a result of Defendants' acts, Broido has suffered irreparable harm.

14   Specifically, Defendants' sale of the Song without proper credit to Broido will

15   continue to cause Broido to suffer irreparable harm for which there is no adequate

16   remedy at law. Therefore, Broido is entitled to restitution and injunctive relief.

17

## SEVENTH CLAIM FOR RELIEF

18

### (For Breach of Contract as to a Third-Party Beneficiary Against All

19

### Defendants)

20      129.   Plaintiff repeats and reincorporates by reference the allegations in the

21   above paragraphs as if fully set forth herein.

22      130.   At all relevant times, Defendants were a signatory to the SAG CBA

23   governing the terms and conditions of employment for background vocal performers

24   engaged in connection with theatrical motion pictures or were acting as the

25   signatory's agents, alter egos, or joint employers. The aforementioned SAG CBA

26   imposes certain duties on signatories, such as the payment of mandatory minimum

27   session wages, health and pension contributions, and reuse and secondary-market

28   compensation for covered background vocalists.



131.   Broido was an intended third-party beneficiary of the SAG CBA and a covered performer, as that term is used within the SAG CBA. Broido rendered vocal services in connection with the Song at the direction of Defendants or its agents and for Defendants' benefit.

132.   Broido fully performed all services required of him under the CBA and all applicable side letters.

133.   Defendants breached the SAG CBA. Defendants failed to pay Broido minimum session wages, failed to remit required health and pension contributions, and failed to pay reuse and residual compensation.

134.   As a direct and proximate result of Defendants' breach, Broido suffered damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

As to the First Cause of Action:

135.   For an order restraining Warner from using or selling the Song;

136.   For an order restraining NBC from using or selling the Song in any part of the *Fast & Furious* franchise.

137.   For an award of damages according to proof at trial;

138.   For punitive and/or exemplary damages;

139.   For attorney's fees and costs;

As to the Fourth Cause of Action:

140.   For a declaration from the Court that Broido is a current co-owner of the Song and that the sound recording was not made pursuant to a work-made-for-hire agreement with Warner Music or NBC;

As to the Second Cause of Action:

141.   For an award of damages according to proof at trial

As to the Third Cause of Action:

142.   For an award of damages according to proof at trial;

COMPLAINT

1    143.   For punitive and/or exemplary damages;

2   As to the <u>Fourth Cause of Action</u>:

3        144.   For an award of damages according to proof at trial;

4        145.   For punitive and/or exemplary damages;

5   As to the <u>Fifth Cause of Action</u>:

6        146.   For an award of damages according to proof at trial;

7        147.   For punitive and/or exemplary damages;

8   As to the <u>Sixth Cause of Action</u>:

9        148.   For an award of damages according to proof at trial;

10        149.   For punitive and/or exemplary damages;

11   As to the <u>Seventh Cause of Action</u>:

12        150.   For an award of damages according to proof at trial;

13   As to <u>All Causes of Action</u>:

14        151.   For such other and further relief as the Court may deem proper.

15

16                          **<u>DEMAND FOR JURY TRIAL</u>**

17   Plaintiff hereby demands a trial by jury on all issues so triable.

18

19   Dated:  January 29, 2026              EARLY SULLIVAN WRIGHT
20                                              GIZER & McRAE LLP

21

22                                      By:  _____*/s/ Devin McRae*_____
23                                          Devin  McRae
24                                          Jeremy Gray
                                           Attorneys for Jacob L.C. Broido
25

26

27

28

EARLY
SULLIVAN
WRIGHT
GIZER &
McRAE LLP
ATTORNEYS AT LAW

                                    **COMPLAINT**